**NEBRASKA PHARMACISTS ASSOCIATION, INC., a Nebraska nonprofit corporation, and Wagey Drug, Inc., a Nebraska corporation, Plaintiffs,**

**v.**

**NEBRASKA DEPARTMENT OF SOCIAL SERVICES, Mary Dean Harvey, Director of the Nebraska Department of Social Services, and Robert Seiffert, Administrator for the Medicaid Program in Nebraska, Defendants.**

No. 4:CV94–3105.

United States District Court,
D. Nebraska.

May 16, 1994.

Daniel E. Klaus and Peter C. Wegman, Lincoln, NE, for plaintiffs.

Donald Stenberg, Atty. Gen., Royce Harper, Asst. Atty. Gen., Michael Rumbaugh and David Cygan, Sp. Asst. Attys. Gen., Nebraska Dept. of Social Services, Lincoln, NE, for defendants.

KOPF, District Judge.

## MEMORANDUM OPINION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Nebraska Pharmacists Association, Inc. ("NPA"), and Wagey Drug, Inc. (Wagey), have sued defendants Nebraska Department of Social Services ("DSS"), Mary Dean Harvey (Harvey), and Robert Seiffert (Seiffert). In their amended complaint, (Filing 6), Plaintiffs claim that Defendants' so-called "copayment program," requiring pharmacists to collect copayments from Medicaid recipients, effectively reduces Medicaid reimbursements to pharmacy providers in violation of federal law. Plaintiffs also claim that Defendants' method of calculating the required copayment violates federal law.[1]

Plaintiffs seek to enjoin enforcement of the copayment program adopted by the State of Nebraska. A temporary restraining order was issued and later converted to a preliminary injunction upon stipulation of the parties. (Filings 7, 8, 9, 12.) Pursuant to Federal Rule of Civil Procedure 65(a)(2), the parties agreed that the hearing on the preliminary injunction could be consolidated with trial on the merits. Accordingly, trial on the merits took place on April 8, 1994, and a briefing schedule was established. The last brief was submitted May 2, 1994.

Finding in favor of Plaintiffs on both of their federal claims, I shall now issue my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.[2]

### I. Facts

The parties have entered into two stipulations of facts. These stipulations, together

---

1. There is also a related pendent state claim. However, neither Plaintiffs nor Defendants address the pendent state claim in their briefs. In any event, my resolution of the federal claims renders the pendent state claim moot.

2. It is my intention that any finding of fact more properly construed as a conclusion of law shall be so construed. It is also my intention that any conclusion of law more properly construed as a finding of fact shall be so construed.

with the evidence admitted pursuant to the stipulations, comprise the straightforward factual record.

The first stipulation, (Ex. 9), provides in pertinent part:

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the doctrine of pendant [sic] jurisdiction.

2. Venue of this action in the United States District Court for District of Nebraska is proper pursuant to 28 U.S.C. § 1391(b).

3. NPA is a not-for-profit corporation organized and existing under Nebraska law. It is a professional association which represents approximately 960 of the approximately 1,200 pharmacists licensed in Nebraska, with regard to all pharmacy matters, including Medicaid reimbursement issues generally and the issues raised in this lawsuit which affect the amount of Medicaid reimbursement received by participating pharmacists. Wagey is a Nebraska corporation with its principal place of business in Lincoln, Nebraska. Wagey, whose owner is a member of NPA, is a pharmacy and is a participating provider under the Nebraska Medicaid program.

4. Defendant Nebraska Department of Social Services ("DSS") is an executive agency of the State of Nebraska. The principal office of DSS is in Lincoln, Nebraska. DSS is the agency charged with the administration of the program which is the subject of this action.

5. Defendant Mary Dean Harvey ("Harvey") is sued in her official capacity as the Director of DSS. Harvey is responsible for all programs administered by DSS, which includes the Nebraska Medicaid Program.

6. Defendant Robert Seiffert ("Seiffert") is sued in his official capacity as the Administrator for the Nebraska Medicaid Program. Seiffert is responsible for the operation of the Medicaid Program, including the copayment program at issue in this lawsuit.

7. Medicaid is a joint federal and state program which provides comprehensive medical services to low income individuals. The program is administered in Nebraska by DSS.

8. As part of the Medicaid program, DSS provides a prescription drug benefit to recipients. Recipients may present prescriptions at a pharmacy which participates in the Medicaid program. The pharmacy fills the prescription and is then reimbursed a sum by DSS pursuant to a formula established by DSS in accordance with federal law.

9. In state fiscal year 1993, payments to pharmacies which participated in the Nebraska Medicaid program, not including supplies or family planning related drugs, constituted approximately 9% of the $530,000,000 Nebraska Medicaid program vendor payments (or net expenditures).

10. DSS estimated that co-payments would reduce costs by approximately $3,000,000 and that co-payments for prescription drugs would generate approximately 75% of those cost savings. Attached as Exhibit 4 is a chart which reflects the estimated savings from the various medicaid [sic] providers.

11. On March 25, 1994, final regulations were certified which would implement the co-payment program in Nebraska effective April 1, 1994. A copy of the regulations is admitted into evidence as Exhibit 2.

12. Based upon the experience of other states which have co-payment programs, the parties acknowledge that some of the co-payments for prescription drugs will not be collectable from the Medicaid recipients.

13. Although some Medicaid recipients will not pay the co-payment, the payment from DSS to pharmacy providers will be reduced by the co-payment amount for all claims which are subject to the co-payment obligation, which includes those claims where the co-payment could not be collected.

14. The State Medicaid Plan does not provide any recourse by the pharmacist against the State of Nebraska for uncollected co-payments.

15. There has never been a determination by Health Care Financing Administra-

tion or the Secretary of Health and Human Services that the Nebraska Medicaid Plan is not in compliance with Federal law or regulation regarding pharmacy reimbursement. The plan amendment which describes the implementation of the co-payment program in Nebraska has been submitted to HCFA and is presently under consideration. As of the date of this Stipulation, HCFA has not notified DSS of either the approval or disapproval of the plan amendment.

16. The parties disagree on the proper methodology to be used to compute the average payment by the State for prescription drugs for purposes of determining the co-payment amount.

Plaintiffs contend that if DSS were to include the following individuals in the data used to compute the average payment for pharmaceutical drugs:

1) Individuals age 18 or younger;

2) Pregnant women through the immediate postpartum period (the immediate postpartum period begins on the last day of pregnancy and extends through the end of the month in which the 60–day period following termination of the pregnancy ends);

3) Any individual who is an inpatient in a hospital, long-term care facility (NF or ICF/MR), or other medical institution if the individual is required as a condition of receiving services in the institution, to spend all but a minimal amount of his/her income required for personal needs for medical care costs;

4) Individuals residing in alternate care, which is defined as domiciliaries, residential care facilities, centers for the developmentally disabled, and adult family homes;

5) Individuals who are receiving waiver services, provided under § 1915(c) waiver, such as the Community–Based Waiver for Adults with Mental Retardation or Related Conditions; the Home and Community–Based Model Waiver for Children with Mental Retardation and Their Families; or the Home and Community–Based Waiver for Aged

Persons or Adults or Children with Disabilities;

6) Individuals with excess income (over the course of the excess income cycle, both before and after the obligation is met); and

7) Individuals who receive assistance under the State Disability Program (SDP)

that the average payment would be approximately $18.63 which would result, under the federal regulations, in a maximum allowable co-payment of $1.00. Defendants do not dispute the mathematical computation of the average payment, but rather dispute the inclusion of the aforementioned individuals.

DSS excluded the individuals listed above from the computation of the average payment for pharmaceutical drugs, which resulted in an average payment of $25.67. Under the federal regulations, this permits a maximum co-payment of $2.00. Plaintiffs do not dispute the mathematical computation of the average payment, but rather dispute the exclusion of the aforementioned individuals.

17. The states of South Dakota, Iowa, Kansas and Missouri all computed their average or typical payment by the state for prescription drugs based upon the total amount paid by the state divided by the total number of prescriptions. No reductions either in dollars or number of prescriptions were made for those categories of individuals who are excluded from the co-payment obligations.

18. As part of OBRA '90, Congress enacted a rebate program for drug manufacturers pursuant to which states receive rebates based upon the amount of money the state medicaid [sic] program spends for prescription drugs. From December, 1990 to March 31, 1994, Nebraska has received $31,407,252 under the rebate program. DSS continues to receive payments from drug manufacturers pursuant to the rebate program.

19. When Defendants calculated the average payment by the state [sic] for prescription drugs, Defendants did not consider the money received by the State

from drug manufacturers pursuant to the rebate program.

The second stipulation, (Filing 20, Ex. 10), establishes that the Federal Health Care Financing Administration approved pertinent amendments to Nebraska's plan under Title XIX of the Social Security Act (regarding cost-sharing for the medically needy and other optional groups).

## II. Law

When a state, such as Nebraska, seeks and obtains federal funds by participating in a federal program, the state is obliged to follow the conditions set by federal law and federal regulations. *See Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (Congress may impose a condition on the grant of federal monies to the states pursuant to its spending powers, providing it does so clearly.). The Supreme Court has explicitly stated that: "State Medicaid plans must comply with requirements imposed both by the Act itself and by the Secretary of Health and Human Services". *Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981) (citing 42 U.S.C. § 1396a.)

The Defendants do not argue that Nebraska is somehow exempt from federal Medicaid law and regulations or that federal Medicaid law and regulations do not apply. Rather for each of Plaintiffs' claims, the Defendants argue that the federal Medicaid law and the related regulations have not been violated. I thus turn to consider the two questions presented in this case.

### A. Does the Nebraska copayment program violate 42 U.S.C. § 1396r–8(f)(1)(B) by effectively reducing reimbursement limits?

Plaintiffs' first claim is that Nebraska's copayment program violates federal law because it effectively reduces reimbursement limits to pharmacists in violation of section 1396r–8(f)(1)(B).

### 1.

This is not a case about whether Medicaid recipients ought to be required to make nominal copayments in order to receive Medicaid. That issue has clearly been resolved by Congress. Congress explicitly permits the various states which participate in the Medicaid program to charge a "nominal" copayment. 42 U.S.C. § 1396o(a)(3); 42 C.F.R. §§ 447.53 & 447.57. However, in the event the recipient of aid is unable to pay, "no provider participating under the State plan may deny care or services to an individual eligible for such care or services under the plan on account of such individual's inability to pay a deduction, cost sharing, or similar charge." 42 U.S.C. § 1396o(e).[3] The foregoing statutory scheme providing for and authorizing copayments was enacted in 1982.

The 1982 copayment authorization cannot, however, be read in isolation. Eight years after it adopted the copayment-authorization statute, Congress also implemented a rebate program for the participating states whereby drug manufacturers made rebate payments directly to the states. 42 U.S.C. § 1396r–8(a)[4]. Among other things, the program required drug manufacturers to provide a minimum rebate to each state Medicaid program. 42 U.S.C. § 1396r–8(c). It is undisputed as a matter of fact that the State of Nebraska, as a participating Medicaid program, has received more than 31 million dollars pursuant to the 1990 rebate program, with payments continuing as of this date. (Ex. 9 ¶ 18.)

As part of the rebate program, Congress also explicitly provided that the federal regulations "used to determine reimbursement limits" could not be modified "to reduce such limits for covered outpatient drugs" 42 U.S.C. § 1396r–8(f)(1)(A). The participating states were likewise prohibited from reducing "the limits for covered outpatient drugs" or the "dispensing fees for such drugs." 42

---

**3.** Note, however, that the quoted subsection "shall not extinguish the liability of the individual to whom the care or services were furnished for payment of the deduction, cost sharing, or similar charge." *Id.*

**4.** This program was a part of the massive Omnibus Budget Reconciliation Act of 1990 (sometime referred to as OBRA '90). Pub.L. No. 101–508, 104 Stat. 1388, et. seq. (November 5, 1990).

U.S.C. § 1396r–8(f)(1)(B).[5] This moratorium ends December 31, 1994. *Id.*

With the foregoing statutory background in mind, it is helpful to understand certain facts which the parties agree are undisputed. The pertinent facts are these:

a. As part of the Medicaid program, DSS provides a prescription-drug benefit to recipients, allowing them to present prescriptions to a pharmacy which participates in the state Medicaid program. (Ex. 9, ¶ 8.)

b. The pharmacy fills the prescription and is reimbursed by DSS pursuant to a formula established by DSS in accordance with federal law. (*Id.*)

c. Final regulations have been adopted by the State of Nebraska which would implement a copayment program. (*Id.*, ¶ 11; Ex. 2.)

d. The parties have stipulated that some of the copayments for prescription drugs will not be collectible from Medicaid recipients. (Ex. 9, ¶ 12.)

e. As indicated above, federal law prohibits a pharmacist from refusing to provide a prescription drug due to an individual's inability to pay the copayment. 42 U.S.C. § 1396o(e). Nebraska regulations also provide that the "provider shall not refuse to provide services to the client if the client is unable to pay the copayment amount at the time of the service." (Ex. 2, 471 NAC § 3–008.04.)

f. Although some Medicaid recipients will not pay the copayment, the "payment from DSS to pharmacy providers will be reduced by the co-payment amount for all claims which are subject to the co-payment obligation, which includes those claims where the

co-payment could not be collected." (Ex. 9, ¶ 13.)

g. Nebraska's plan "does not provide any recourse by the pharmacist against the State of Nebraska for uncollected copayments." (*Id.*, ¶ 14.)[6]

**2.**

Determining whether Nebraska's copayment program violates the federal statutes requires me to find and apply appropriate principles of statutory construction. The following principles of statutory construction are applicable in this case, and I have applied them.

■ The starting point for the interpretation of a statute must be its plain language. *Arkansas AFL–CIO v. FCC,* 11 F.3d 1430, 1440 (8th Cir.1993); *In re Windsor on the River Associates, Ltd.,* 7 F.3d 127 (8th Cir. 1993). When engaging in this analysis, one should interpret the words of the statute in light of the purposes Congress sought to serve. *In re Windsor,* 7 F.3d at 130.

■ A court should avoid a statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress. *Id.*

■ If analysis of the statutory language does not yield an unambiguous congressional intent, the court may then look to the legislative history. *Arkansas AFL–CIO,* 11 F.3d at 1440.

■ After applying appropriate principles of statutory construction and examining the case law, I come to four conclusions. First, a plain reading of the statutes favors the pharmacists. Second, unlike Plaintiffs' argument which gives meaning to both the 1982 and 1990 legislation, the reading of the statutes

---

5. There is no dispute that Nebraska is a participant in the rebate program and was "in compliance" with federal regulations such that the State was otherwise subject to 42 U.S.C. § 1396r–8(f)(1)(B): (Ex. 9, ¶ 15.)

6. Nebraska regulations provide that if "it is the routine business practice of the provider to refuse service to any individual with uncollected debt, the provider may include uncollected copayments under this practice" if the provider gives sufficient notice to the client before service is denied. (Ex. 2, 471 NAC § 3–008.04.) In

effect, the regulations require pharmacists to provide services even though the recipient cannot pay the copayment and will not be able to pay the copayment, although once having suffered such a loss, a pharmacist may, if he or she does so as a routine matter for every other client, deny subsequent services to a Medicaid recipient upon sufficient advance notice. Note, however, that a pharmacist must suffer loss before refusing to provide services to a Medicaid recipient who is unable to pay the copayment because there must first be "uncollected debt".

suggested by the Defendants gives meaning to the 1982 legislation but not the 1990 legislation. In this regard, Defendants' version would also permit states to render a statutory provision meaningless. Third, to the extent a plain reading of the statutes is not decisive, the legislative history supports the pharmacists. Fourth, although few precedents exist, what case law there is on the subject tends to support the pharmacists.

#### a.

■ It is obvious from the words of 42 U.S.C. § 1396r–8(f)(1)(B) that the "reimbursement limits" were not to be reduced by the states. Under the heading "Pharmacy reimbursement" and "No reduction in reimbursement limits", section 1396r–8(f)(1)(B) provides that the states may not "reduce the limits for covered outpatient drugs ... or dispensing fees for such drugs." These words are clear.

Obviously, the statutory words prohibit the states from tinkering with the formulas used to calculate the reimbursement limits so as to reduce the amount of money pharmacists receive. It is also plainly evident that the statute prohibits the states from doing indirectly what cannot be done directly. That is, the statutory language prohibits the states from charging the pharmacists with the uncollectible costs of the copayments thereby effectively reducing the reimbursement limits just as surely as if the formulas had been tinkered with.

It is a perversion of the words of the statute to suggest, as Defendants do, that states may effectively reduce reimbursements limits to pharmacists so long as they do not alter the formula by which the limits are calculated. The word "limits" only has meaning in reference to what the "limits" pertain to, and the "limits" pertain to "reimbursements". It is therefore absurd to suggest that Congress intended to preserve abstract formulas but not preserve the level of reimbursement produced by application of those formulas.

For a certain but unknown percentage of Medicaid claims submitted by pharmacists the "reimbursement limit" has effectively been reduced by the copayment obligation.

It is undisputed that in a certain number of cases, the Medicaid recipient will not be able to pay the copayment, the pharmacy must provide the prescription nevertheless, and the copayment will be uncollectible. Thus, the so-called "reimbursement limits" are, in every real sense, reduced.

It is just as though Defendants had drafted a statute and regulation which provided that "the reimbursement limits to pharmacists as set forth in the pertinent federal and state regulations are reduced by the amount of uncollectible copayment charges." In effect, Defendants have ordered that in certain cases a pharmacist may *never actually* recover the reimbursement limits notwithstanding the fact that the pharmacist would theoretically be eligible for the maximum reimbursement. The plain words of the federal statute prohibit this practice.

#### b.

An interpretation of the statutes as urged by the pharmacists is consistent with the purposes Congress sought to serve in 1990 as well as 1982. Conversely, the interpretation urged by the Defendants is not consistent with the 1990 legislation, and renders the prohibition against reduction in limits found in section 1396r–8(f)(1)(B) meaningless.

In 1990 Congress sought to provide the states with an enormously lucrative rebate program in partial exchange for a moratorium on reduction of reimbursement levels to pharmacists. Moreover, to say that the copayment program cannot be used to circumvent section 1396r–8(f)(B), is entirely consistent with the 1982 congressional authorization for states to collect copayment obligations from Medicaid recipients. By its express terms, the copayment authorization does not pertain to pharmacists or other providers, but rather to "individuals ... who are eligible under the plan" to receive Medicaid benefits. 42 U.S.C. § 1396o(a).

As a consequence, the following construction most closely harmonizes the 1982 and 1990 federal Medicaid legislation:

a. By virtue of 1982 legislation, the states may charge a copayment to Medicaid recipients.

b. By virtue of the 1990 legislation, the states are guaranteed substantial rebates from drug manufacturers until December 31, 1994.

c. By virtue of the 1990 legislation, the states are not to reduce reimbursement limits to pharmacists until after December 31, 1994.

d. By reading the 1982 and 1990 legislation in a way which gives meaning to each legislative enactment, the states may implement a copayment program during the pendency of the rebate program, but during the pendency of the rebate program the states may not effectively reduce the reimbursement limits to druggists by passing on the costs of uncollectible copayment obligations.

To interpret the federal statutory scheme as proposed by Defendants gives meaning to the 1982 legislation, but essentially ignores the 1990 legislation. Moreover, the interpretation urged by Defendants renders section 1396r–8(f)(1)(B) meaningless to the extent of the cost of uncollectible copayments.

### c.

Third, although I do not believe the statutory scheme under review is ambiguous, if it is appropriate to resort to legislative history, the legislative history, to the extent it is revealing, supports the pharmacists.

The House Report of the Budget Committee, No. 101–881, dated October 16, 1990, regarding the Omnibus Budget Reconciliation Act of 1990, discusses the drug-rebate program in some detail. H.R.Rep. No. 881, 101st Cong., 2d Sess. 1, 95–98 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2107–10. The report states:

> The Committee believes that Medicaid, the means-tested entitlement program that purchases basic health care for the poor, should have the benefit of the same discounts on single source drugs that other large public and private purchasers enjoy. The Committee bill would therefore establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser. *Id.* at 96; 2108.

With regard to the Medicaid recipients and their pharmacists, the legislative history indicates it was not the intent of Congress to cause an alteration in the current *payment arrangements.* For example, the report states that the "Committee emphasizes that the bill is framed to achieve significant Medicaid savings with the minimum possible amount of disruption of current program arrangements." *Id.* at 98; 2110. The committee report makes clear that the bill would not *"alter the current payment arrangements between State Medicaid programs and pharmacists." Id.* (Emphasis added.) *See also* H.R.Conf.Rep. No. 964, 101st Cong., 2d Sess., 821, 827, 832 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2526, 2532, 2537.

This history makes clear that Congress did not give the word "limits" in section 1396r–8(f)(1)(B) the special meaning suggested by Defendants. Rather, Congress was merely directing the states not to "alter the current payment arrangements between State Medicaid programs and pharmacists."

### d.

Finally, I turn to the case law.

At least one case has held that similar copayment regulations violate federal law. *Pharmaceutical Soc'y of the State of N.Y., Inc. v. New York State Dep't of Social Servs.,* 1994 WL 33369 (N.D.N.Y. Jan. 18, 1994) ("While DSS attempts to circumvent this charge by claiming that co-payments are merely 'cost shifts' rather than reductions, this court finds that such reasoning defies common sense.... Because providers cannot require a recipient to pay as a condition of receiving services, they will frequently not receive this 'shifted' cost.... Therefore, this court finds that a co-payment that a provider has no right to demand in exchange for services is not a cost shift, but a reduction in reimbursement."). *Id.,* 1994 WL 33369 at \*2–3. *See also Pennsylvania Pharmaceutical Ass'n v. Casey,* 800 F.Supp. 173, 178 (M.D.Pa.1992) ("The plain language of OBRA 90 clearly forbids a compliant state from reducing payments for covered outpatient drugs.").

On the other hand, a Florida court found that the fact that the recipients "may not be so forthcoming with reimbursement does not change the fact that the reimbursement limits have not been changed by the co-payment

program." Therefore, Florida's copayment program did not violate 42 U.S.C. § 1396r–8(f). *Florida Pharmacy Ass'n v. Williams*, TCA 92–40142–MMP (N.D.Fla. Nov. 6, 1993) (unpublished), slip op. at 5. I decline to follow the Florida case for two reasons.

The Florida case is too short on analysis. Moreover, to the extent that the Florida case is based upon a doubt that actual reimbursements will be reduced, the facts in this case are to the contrary.

It is undisputed, and Defendants have so stipulated, that if the copayment regulations are implemented, in a certain percentage of cases pharmacists will receive a reduced level of reimbursement to the extent of the uncollectible funds. As one of the defendants in this case stated in her report to the governor and legislature: "If the provider cannot collect the copayment from the recipient, and s/he cannot be reimbursed by the Department for the uncollected amount, a direct reduction in payment for the service results." (Ex. 103 (Attach.) Harvey, *Report to the Governor and Legislature Cost Sharing Medicaid Program* 1, 11 (Dec. 1, 1993).

Accordingly, to the extent the Florida case is based on the premise that there is no actual likelihood of a reduction in reimbursements, the Florida case is distinguishable on the facts.

### 3.

This case brings to mind Gertrude Stein's familiar words: "Rose is a rose is a rose is a rose." G. Stein, *Sacred Emily* (1913), reprinted in J. Bartlett, *Familiar Quotations* 1, 627 (16th ed., 1992). A reduction is a reduction, whether by change in a formula or otherwise. Nebraska's copayment statutes and regulations violate 42 U.S.C. § 1396r–8(f)(1)(B), and the pharmacists are consequently entitled to injunctive relief.

**B. Does the method used by Nebraska in calculating the standard copayment violate 42 C.F.R. § 447.55(b) by excluding certain persons from the computation of the "average or typical payment for that service"?**

The pharmacists also argue that the flat two-dollar copayment used by Nebraska vio-

lates the federal regulations enacted pursuant to 42 U.S.C. § 1396o(b)(3). Section 1396o(b)(3) states, in pertinent part, that "any [copayment] under the plan ... will be nominal in amount (as determined by the Secretary in regulations ...)."[7] In compliance with 42 U.S.C. § 1396o, the Secretary adopted two regulations which all parties agree are dispositive of the issue in this case (although both sides hold quite different views about what the regulations mean).

### 1.

The Secretary gave the states two choices.

First, a state might impose a "sliding-scale" copayment as follows:

a. Where the state's payment for the service was ten dollars or less, the copayment could not exceed fifty cents.

b. Where the state's payment for the service was $10.01 to $25.00, the maximum copayment was one dollar.

c. Where the state's payment for the service was $25.01 to $50.00, the maximum copayment was two dollars.

d. Where the state's payment for the service was $50.01 or more, the maximum copayment was three dollars.

42 C.F.R. § 447.54(a)(3).

Alternatively, the state could adopt a so-called "standard" copayment in which the state determined its "average or typical payment for that service" and then applied the maximum copayment limitations set forth in the sliding scale found in 42 C.F.R. § 447.54(a)(3). 42 C.F.R. § 447.55(b) ("This standard copayment amount for any service may be determined by applying the maximum copayment amounts specified in § 447.54(a) and (b) to the agency's average or typical payment for that service.") The regulation gives an example: "For example, if the agency's typical payment for prescribed drugs is $4 to $5 per prescription, the agency might set a standard copayment of $0.50 per prescription." *Id.*

---

7. Note that 42 U.S.C. § 1596o(b)(2) prohibits a state from implementing a copayment program for certain categories of people, such as pregnant women, children, and nursing home residents.

In this case, it is undisputed that Nebraska has adopted the so-called standard copayment option. A Medicaid recipient must pay a two-dollar copayment for each prescription. (Ex. 9, ¶ 16.)

In computing the "average or typical payment *for that service,*" Defendants used an averaging method, but excluded from the average Medicaid recipients against whom the law prohibited collection of a copayment, such as individuals under the age of 18, pregnant women, and nursing home patients. (Ex. 9 ¶ 16.) *See* 42 U.S.C. § 1396o(b)(2); 42 C.F.R. § 447.53(b). By excluding these individuals, the "average or typical" payment for prescription services (computed as an average) was $25.67. (Ex. 9 ¶ 16.) Therefore, applying the sliding scale found in 42 C.F.R. § 447.54(a)(3), the State of Nebraska was authorized by federal regulation to charge a standard copayment of two dollars. (Ex. 9, ¶ 16.)

If the calculation included individuals who were not obligated to make the copayment (thus constituting the full range of persons receiving Medicaid prescription assistance), the average payment would have been approximately $18.63, resulting in a maximum allowable copayment under federal regulations of one dollar. (Ex. 9 ¶ 16.)

**2.**

When a court construes an administrative regulation, the normal tenets of statutory construction are generally applied. *Black & Decker Corp. v. Commissioner,* 986 F.2d 60, 65 (4th Cir.1993). The plain meaning of words is ordinarily the guide to the definition of a regulatory term. *T.S. v. Board of Educ.,* 10 F.3d 87, 89 (2d Cir.1993).

Additionally, the regulation must of course be "interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements". *Secretary of Labor v. Western Fuels–Utah, Inc.,* 900 F.2d 318, 320 (D.C.Cir.1990) (*quoting Emery Mining Co. v. Secretary of Labor,* 744 F.2d 1411, 1414 (10th Cir.1984)).

Still further, where an administrative agency has developed an interpretation of its own regulation, judicial deference is due that interpretation *if:* the agency has developed its interpretation contemporaneously with the regulation; the agency has consistently applied the regulation over time; and, the agency's interpretation is the result of thorough and reasoned consideration. *Sioux Valley Hosp. v. Bowen,* 792 F.2d 715, 719 (8th Cir.1986) (refusing to give deference to Secretary's interpretation of certain Medicaid policies).

**3.**

I turn next to an application of these principles.

It is evident that the plain meaning of the regulations requires that Defendants base their calculation on the "average or typical payment *for that service.*" 42 C.F.R. § 447.55(b) (emphasis added.) The words "for that service" quite obviously refer to "prescriptions" covered under Medicaid. Indeed, the regulation provides that "if the agency's typical payment for prescribed drugs is $4 to $5 per prescription, the agency might set a standard copayment of $0.50 per prescription." There is nothing about the plain words of the regulation or the example used in the regulation which suggests that it was permissible to compute the "average or typical payment for that service" by omitting classes of individuals who receive the service ("prescriptions") but are exempt from the copayment limitation.

Indeed, the impact of Defendants' calculation is to increase by 100 percent the copayment obligation which, according to the statute, was required to be "nominal in amount." Although the difference between a one dollar or two dollar copayment may seem "nominal", the difference is significant (and not nominal) to those who are poor and in need of prescription drug services. Thus Nebraska's interpretation of the Secretary's regulation seems inconsistent with Congressional desire that the copayment be "nominal".

Essentially, Defendants have ignored the fact that the regulation requires that a standard copayment must be computed using the "average or typical payment *for that service*". Rather, Defendants have computed the standard copayment using the "average or typical payment *for persons paying a*

*copayment for that service."* In so doing, Defendants have ignored the plain words of the regulation, and have unnecessarily added a qualifying term. The result is an increase of 100 percent in what was intended by Congress to be a "nominal" copayment.

Defendants' sole argument in defense of their computation is that the United States Department of Health and Human Services ("HHS") has reviewed and approved Nebraska's plan amendments and this court should give due deference to that review and approval because it constitutes HHS' interpretation of its own regulations.[8]

Defendants are correct in stating that HHS approved the amendment to Nebraska's plan. (Filing 20 Ex. 10.) However, nowhere in the plan amendments did Nebraska explain how it calculated the copayment. (*Id.*) Nebraska simply stated that as a basis for "determining the copayment amount, the standard copayment amount is determined by applying the maximum copayment amounts [specified in the regulations] to the agency's average or typical payment for that service." (*Id.* attach. 4.18–c, at 1.)

There is no reason to think HHS approved the accuracy of Nebraska's mathematical calculation since it was not revealed. Therefore, HHS' approval of Nebraska's plan does not constitute the type of "thorough and reasoned consideration" to which this court would be obligated to defer. *Sioux Valley Hosp.,* 792 F.2d at 719 (refusing to give due deference to HHS' interpretation of a Medicare labor/delivery room reimbursement policy).

#### 4.

In summary, Defendants elected to adopt a flat-rate copayment charge purporting to use the "average or typical payment for that service." In reality, however, the computation represents the average or typical payment for only those individuals required to make the copayment. This is in stark violation of the plain words of the implementing regulation. Accordingly, the pharmacists are entitled to injunctive relief.

### III.

While I shall grant the injunctive relief requested by the pharmacists, I pause to make certain observations so that I will not be misunderstood. I do not doubt that Nebraska could properly implement a copayment program generally requiring pharmacists to collect copayments, providing that the risk of loss from failure to collect the copayments is not improperly shifted to the pharmacists. Moreover, I do not mean to suggest that the manner in which the pharmacists propose that a standard copayment be calculated is the only proper way.

I conclude only that:

a. The present copayment plan implemented by Nebraska effectuates a real reduction in pharmacy reimbursement limits in violation of 42 U.S.C. § 1396r–8(f)(1)(B).

b. Nebraska's present method of calculating the flat copayment amount for prescription drugs is not determined in accordance with 42 C.F.R. § 447.55(b) in that Nebraska has not properly calculated its "average or typical payment for that service."

Accordingly,

IT IS ORDERED that:

(1) Judgment shall be entered in favor of Plaintiffs, and against Defendants, providing that Defendants and their employees are permanently enjoined from enforcing or otherwise administering the Nebraska copayment program issued pursuant to Neb.Rev. Stat. §§ 68–1019 and 68–1021 (1993 Supp.) and the Nebraska Department of Social Services Manual, 471 NAC 3–008.01 and 3–008.04, but only insofar as said program relates to prescription drugs;

(2) The parties are ordered to continue to perform the terms and conditions of the escrow agreement (Filing 9), notwithstanding

---

**8.** The parties have stipulated that the surrounding states of South Dakota, Iowa, Kansas, and Missouri all compute their average or typical payment in the manner proposed by the pharma-

cists. (Ex. 9 ¶ 17.) There is no evidence that any other state follows Nebraska's method of calculating a standard copayment.

any time limitations contained therein, until further order of the court.[9]

9. This provision is designed to maintain the status quo during the pendency of any appeal.