**In re L. NATURAL FOODS CORPORATION,**
Debtor.

**Bankruptcy No. 96–13194SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 6, 1996.

Alan Moldoff, Adelman Lavine Gold and Levin, Philadelphia, PA, for Bedemco Import Export Inc.

James W. Henbnessey, Barbara T. Dubrow, Sherr, Joffe and Zuckerman, P.C., West Conshohocken, PA, for Midlantic Bank.

Michael Andrew Cibik, Philadelphia, PA, for Debtor.

Christine C. Shubert, Tabernacle, NJ, Chapter 7 Trustee.

### *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

#### *Introduction*

Before the Court is the Motion of Bedemco Import Export, Inc. ("Bedemco") for Relief From the Automatic Stay Pursuant to 11 U.S.C. 362(d), and for an Order Requiring the Turnover of Certain Monies that are Currently Being Held in Escrow by Midlantic Bank, N.A. ("Midlantic"), a secured creditor of debtor L. Natural Foods Corp. ("Debtor"). Bedemco premises its entitlement to the funds under the Perishable Agricultural Commodities Act ("PACA" or the "Act"), 7 U.S.C. §§ 499a–499s, alleging that the escrowed monies are proceeds that resulted from Midlantic's sale of a certain inventory of the Debtor in dried apricots and prunes, product that Bedemco claims was subject to a statutory trust in its favor arising under the Act. Bedemco posits that its right to the escrowed monies under PACA is superior to any competing interest that Midlantic may have in the Debtor's inventory generally.

A hearing on the Motion was held June 20, 1996. For the reasons set forth below, the

Court concludes that Bedemco does not hold a valid interest in the escrowed monies under PACA because the dried fruits in question do not qualify as "perishable agricultural commodities" within meaning of the Act. Accordingly, Bedemco's Motion must be denied.

### Jurisdictional Statement

The Court has jurisdiction over the parties and the subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334, 157(b)(1), (b)(2)(A), (G), (K) and (O).

### Background

Bedemco. is in the business of importing and exporting dried fruits and nuts for sale to wholesale distributors in the United States and Canada. Its business operations are located in White Plains, New York. On November 8, 1995, Bedemco issued a document bearing the caption "Sales Confirmation" that confirmed the Debtor's order of fifteen-hundred cartons of "Turkish Dried Apricots" at a cost of $46,536.00, delivered to the Debtor's warehouse. Exhibit "B–1". The sale was on net thirty day credit terms. *Id.* At the time that it placed the order, the Debtor was operating as a wholesale distributor of dried fruits and nuts in Philadelphia, Pennsylvania. On or about January 5, 1996, prior to the delivery of the dried apricots, the Debtor placed an order with Bedemco for twenty cartons of prunes at a non-delivered cost of $570.00. This sale was also on net thirty day credit terms. Exhibit "B–3". The Debtor picked up the prunes on January 10, 1996. In connection with the prunes sale Bedemco issued invoice number 1999, dated January 10, 1996, in the amount of $570.00. Exhibit B–4. Shortly thereafter, on January 18, 1996, the dried apricots arrived in this country and were delivered to the Debtor. In connection with that shipment, Bedemco issued invoice number 2012, dated January, 18, 1996, in the amount of $46,536.00. Exhibit "B–2".

The next month, however, on February 21, 1996, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code"). 11 U.S.C. §§ 101–1330. On April 9, 1996, the Debtor's case was voluntarily converted to a proceeding under Chapter 7. It is not disputed that the Debtor failed to pay for either of the above purchases prior to filing its petition. Bedemco claims that the Debtor owes it $47,-106.00 for both invoices, plus interest and legal fees under the terms of the Sales Confirmation documents. Exhibits "B–1" and "B–3".

Midlantic has filed a secured Proof of Claim in the amount of $148,727.78, claiming a blanket security interest in, among other things, all inventory, equipment and receivables of the Debtor. In its motion for relief from the automatic stay, filed on April 18, 1996, Midlantic alleged that its security interest covered various obligations of the Debtor, including those arising under a commercial term note to the Debtor dated November 28, 1994, an overdraft line of credit for the Debtor's checking account, and surety agreements that had been executed on behalf of two officers of the Debtor. Neither the amount of the debt owed to Midlantic, nor the validity of its security interest have been called into doubt by Bedemco. Midlantic requested, and was granted, an expedited hearing on its motion due to the alleged perishability of the Debtor's inventory.

In its response to the motion, Bedemco did not oppose Midlantic's request for relief from the automatic stay. Rather, Bedemco alleged the existence of a non-segregated floating trust arising under PACA, 7 U.S.C. § 499e(c)(2), which it claimed granted it a superior right to have the amounts owed by the Debtor satisfied out of the Debtor's inventory of perishable agricultural commodities, products derived therefrom, and any receivables or proceeds resulting from their sale. Thus, while Bedemco did not specifically oppose the motion, it nonetheless requested that to the extent relief were to be granted, that the Order should be "without prejudice to Bedemco's right, title and interest in the assets constituting the trust res [under 7 U.S.C. § 499e(c)(2)] and which Order shall specifically preserve all such rights, title and interest." Bedemco Response, at 3. By Order entered on April 26, 1996, the Court granted Midlantic's motion allowing it to proceed with its state court remedies, including the liquidation of the inventory of

the Debtor, subject, however, to the rights, if any, of Bedemco under PACA. The Order specifically provided that the proceeds of any sale of the product were to be held in escrow by Midlantic pending resolution of Bedemco's claims under PACA. Finally, in order to bring these claims to light the Order directed Bedemco to file a motion within thirty days asserting any claim it might have under PACA. The dried apricots and prunes were thereafter sold by Midlantic, for which it received payment in the approximate amount of $29,000.00.[1] Transcript at 50. This sum is currently being held in escrow by Midlantic pursuant to the Order.

In response to the Court's direction in the Order of April 26, 1996, Bedemco filed the instant motion seeking relief from the automatic stay and for turnover of the funds being held by Midlantic. At the hearing on the motion, held on June 20, 1996, Bedemco argued, *inter alia,* that the sale of the dried apricots and prunes to the Debtor resulted in the creation of a statutory trust under PACA, 7 U.S.C. § 499e(c)(2), that entitles it to recover the amount owed for the purchase those items from the proceeds resulting from their liquidation, notwithstanding any security interest of Midlantic in the Debtor's inventory generally.

Conversely, Midlantic argues that the dried apricots and prunes in question are not subject to the trust provision of PACA because they do not constitute "perishable agricultural commodities" within the meaning of that statute. Rather, Midlantic contends that the processes by which fresh apricots and plums are converted into dried apricots and prunes, respectively, effect such fundamental changes to both fruits that in their new form they must be considered "articles of food of a different kind or character", 7 C.F.R. § 46.2(u), that fall outside of the trust provision of PACA. Midlantic contends, therefore, that Bedemco fails to state a claim under PACA that would entitle it to benefit from the statutory trust, and that accordingly, Bedemco is merely a general unsecured creditor of the Debtor.

The foregoing issues, having been fully argued by the parties, are now ripe for adjudication.

## DISCUSSION

The matter presently before the Court concerns a question of first impression; to wit: whether particular types of dried fruit, dried apricots and prunes in this case, constitute "perishable agricultural commodities" within the meaning of 7 U.S.C. § 499e(c)(2), the trust provision of PACA. Generally, this section of PACA creates a non-segregated floating trust in such commodities, related products and their proceeds, which entitles the seller to receive payment for those goods ahead of other creditors of the buyer that have liens or security interests in the buyer's inventory. *See e.g., Tom Lange Co., Inc. v. Kornblum & Co., Inc. (In re Kornblum & Co., Inc.),* 81 F.3d 280, 284 (2d Cir.1996); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1066 (2d Cir.1995).

Congress enacted PACA in 1930 to regulate interstate commerce in perishable agricultural commodities and to encourage fair trading practices in the marketing of such items. Originally, PACA established a mandatory licencing scheme, under the supervision of the Secretary of Agriculture, for dealers, brokers, and commission merchants of perishable agricultural commodities, 7 U.S.C. § 499c(a), and prohibited certain unfair trading practices that often occurred in the trading of such commodities. A principal purpose of PACA was " 'to provide a practical remedy to small farmers and growers who were vulnerable to the sharp practices of financially irresponsible and unscrupulous brokers in perishable commodities.' " *O'Day v. George Arakelian Farms, Inc.,* 536 F.2d 856, 857 (9th Cir.1976) (*quoting Chidsey v. Geurin,* 443 F.2d 584, 587 (6th Cir.1971)).

In 1984, in the face of an ever increasing number of defaults by the purchasers of perishable agricultural commodities, Congress amended PACA to broaden the protections afforded to produce suppliers. *See Endico Potatoes, Inc.,* 67 F.3d at 1066, 7 U.S.C.

---

1. At the hearing, counsel for Midlantic stated that the price obtained for the items was $34,000.00, but that due to a shortage at the time of delivery, the price received was ultimately reduced to "$29,000.00 and change." Transcript at 50.

§ 499e(c)(1); H.R.Rep. No. 98–543, 98th Cong., 1st Sess. 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 406–07. The following excerpt from the House report that discusses the 1984 amendments highlights the difficulties that had been encountered by a growing number of commodities suppliers:

[PACA] has worked well in making the marketing of perishable agricultural commodities more orderly and efficient. However, in recent years, there has been a substantial increase in instances where commission merchants, dealers of [sic] brokers have failed to pay for perishable agricultural commodities received by them or have been slow in making payment therefor.

. . . . .

Sellers of perishable agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all. Many sales are consummated while the commodities are en route to a particular destination. Under such conditions, it is often difficult to make credit checks, conditional sales agreements and take other traditional safeguards.

. . . . .

Many commission merchants, dealers and brokers, in the normal course of their business transactions, operate on bank loans secured by their inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. *Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.*

H.R.Rep. No. 98–543, at 3 (emphasis added), reprinted in 1984 U.S.C.C.A.N. at 406–07; *see also, In re Kornblum & Co., Inc.,* 81 F.3d at 283.

To ameliorate the above problem, Congress amended PACA to include a provision that imposes a non-segregated floating trust on perishable agricultural commodities, the products derived therefrom, and any proceeds from the sale of such items, in order to enable the sellers of the commodities to maintain a right to recover against the purchaser that would be superior to the claims of all creditors of such purchaser, including those of secured creditors. *See Endico Potatoes, Inc.,* 67 F.3d at 1066; *In re Lombardo Fruit and Produce Co.,* 12 F.3d 806, 809 (8th Cir.1993). The trust provision created by the 1984 amendments is codified at 7 U.S.C. § 499e(c)(2), and reads:

Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

In order to qualify for the trust created by 7 U.S.C. § 499e(c)(2), the unpaid seller, Bedemco in this case, must show: 1) that the sale involved "perishable agricultural commodities," *id.;* 2) that such commodities were received by a "commission merchant, dealer or broker", *id.;* and 3) that it provided written notice of its intent to preserve the benefits of the statutory trust within 30 days after failing to receive payment for the goods. 7 U.S.C. § 499(e)(c)(3). Both the second and third criteria have not been contested by Midlantic, and are therefore conceded. Thus, the dispute in the matter *sub judice* centers on whether the dried apricots and prunes Bedemco sold to the Debtor constitute "perishable agricultural commodities" within the meaning of the Act.

Turning to the definitional section of the statute, the Court observes that the term "perishable agricultural commodities" is broadly defined to "[m]ean any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind or character...." 7 U.S.C.

§ 499a(b)(4)(A). Bedemco contends that the dried apricots and prunes in question fall within this definition because the processes employed in converting "fresh" apricots and plums into the dried fruit items sold are consistent with the treatments enumerated in 7 C.F.R. § 46.2(u), the Department of Agriculture definition of "fresh fruit."

A review of PACA reveals no explicit definition of the term "fresh fruit". Observing, however, that 7 U.S.C. § 499o contains a specific grant of authority to the Secretary of Agriculture to promulgate regulations that may be necessary to carry out the provisions of the Act, it appears that the cited regulation, 7 C.F.R. § 46.2(u), was intended to bridge this definitional gap. In pertinent part, 7 C.F.R. § 46.2(u), states as follows:

*Fresh fruits and fresh vegetables* include all produce in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage, *but do not include those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character.* The effects or the following operations shall not be considered as changing a commodity into a food of a different kind or character: Water or steam blanching, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture; fumigating, gassing, heating for insect control, ripening and coloring; removal of seeds, pits, stems, calyx, husk, pods, rind, skin, peel, et cetera; polishing, precooling, refrigerating, shredding, slicing, trimming, washing with or without chemicals; waxing, adding of sugar or other sweetening agents; adding ascorbic acid or other agents used to retard oxidation; mixing of several kinds of sliced, chopped, or diced fruits or vegetables for packaging in any type of containers; or comparable methods of preparation.

7 C.F.R. § 46.2(u) (emphasis added).

In support of its claim that the dried fruit items sold to the Debtor satisfy this definition, Bedemco introduced the testimony of Jeffrey Abels ("Abels"), a self described "food scientist" and president and owner of Farm Trade Service Corporation, a consulting firm that specializes in inspecting, testing and grading imported dried fruits, nuts, edible seeds and spices. Transcript at 20. Abels testified that the process of making dried apricots begins after harvesting. He stated that the first step involves treating the harvested fruit with sulfur dioxide, usually by burning sulfur in a sealed chamber containing the fruit. This process helps to preserve the fruit by inhibiting both oxidation, which causes browning, and yeast activity. *Id.* at 24. Next, the sulfured apricots are sun dried. The primary function of this process is to lower the "water activity" at the surface of the fruit that would otherwise be available for microbial activity. *Id.* Abels testified that this process involves laying the fruit on mats on the ground "for a couple of days" after which they are turned over and pitted, and then laid out in the sun again so that the other side is exposed to the sun. *Id.* During the sun drying process the fruit are kept whole. After the drying process is completed the fruit are washed, sized and then brought to market. From the market the dried fruit are taken to factories where they are again washed and sized. Any water left on the product after the second washing process is removed either by additional sun drying, or by artificial means such as by exposure to heated dry air.[2] The product is then graded and bulk packed. *Id.* Abels testimony was generally corroborative of earlier testimony provided by Roni Detoledo ("Detoledo"), vice president of Bedemco, concerning the processing of dried apricots.

Upon cross examination, Abels testified that individual lots of dried apricots, consisting of approximately 1,400 cartons of bulk product, would have an "average moisture content of around 24 percent [or] 23 percent." Transcript at 38. He also testified that the Association of Foods Industries standard for Turkish dried apricots allowed for a maximum moisture content of 24%. *Id.* at 40. Consistent with these figures, he tes-

2. By means of an offer of proof made after the close of the record, Bedemco's counsel asserted that the dried apricots in question were not subjected to any drying processes other than sun drying.

tified that a substantial amount of the water content of an apricot in its natural state is removed during the sun drying process. *Id.* Although having previously responded in the affirmative to Bedemco's inquiry as to whether the sun drying of the apricots is the same as drying for the removal of surface moisture, *id.* at 32, Abels contradicted his prior testimony by admitting under cross examination that the process of removing internal moisture from a fresh apricot to make it a dried apricot is different from drying merely for the removal of surface moisture. *Id.* at 39. On re-direct, Abels opined that the removal of surface moisture from the fruit can also result in the removal of water that is not on the surface. *Id.* at 42.

With much less detail Abels testified that the process of making prunes involves dehydrating plums to remove as much moisture as possible from the fruit. He stated that the water content in dehydrated foods is generally less than 20%, with moisture levels in some foods being as low as 7%. Transcript at 33. Consistent with this, Detoledo testified earlier in the proceeding that a prune is essentially a dried plum. He testified that the prunes sold to the Debtor were harvested and dehydrated in ovens in Bulgaria. *Id.* at 12. He also stated that the moisture content of a prune is probably around 7% or 8% after being dehydrated, but that some moisture is eventually returned to the fruit in order to make it an edible product. *Id.* at 18. No testimony was provided as to how much moisture is subsequently reintroduced to the fruit. Detoledo testified that the prunes involved here were rehydrated, pitted and packed in the United States. *Id.* at 12.

From the testimony developed at trial, it appears that the processing of the dried apricots included the addition of sulfides to retard oxidation, pitting, sun drying, and washing. Of these procedures, the addition of an antioxidant, pitting, and washing are expressly provided for under 7 C.F.R. § 46.2(u). Indeed, Midlantic does not contest the per-

missibility of any of these steps. Midlantic does, however, take issue with the sun drying process described in the testimony, which it contends goes well beyond "drying for the removal of surface moisture" permitted under the regulation. Midlantic's chief contention is that the sun drying process employed removed so much moisture from the fresh apricots that began the process, that it actually transformed the apricots into "articles of food of a different kind or character", 7 C.F.R. § 46.2(u), therefore excluding the resulting product, dried apricots, from the protections afforded by 7 U.S.C. § 499e(c)(2). Midlantic raises essentially the same argument with respect to the dehydration process that plums undergo in the making of prunes.

■ Based on the foregoing, it appears that the dispute concerning the dried apricots turns on whether the sun drying process employed comports with the "drying for the removal of surface moisture" exception provided in 7 C.F.R. § 46.2(u). The Court observes, however, the absence of a precise definition of this term in either the plain language of the regulation or the statute that it implements. *Cf. Nebraska Pharmacists Ass'n, Inc. v. Nebraska Dept. of Social Services,* 863 F.Supp. 1037, 1046 (D.Neb.1994) (regulations are to be interpreted so as to harmonize with the statutes that they implement). Further complicating the inquiry, it appears that there are no published decisions of the Department of Agriculture that interpret this particular provision of the regulation. *Cf. Sekula v. Federal Deposit Ins. Corp.,* 39 F.3d 448, 453 (3rd Cir.1994) (an administrative agency's consistent interpretation of its own regulation is entitled to deference unless it is plainly erroneous or inconsistent with the regulation). In overcoming these obstacles, the Court is mindful that it is a fundamental canon of statutory construction that words chosen by the drafter are generally to be interpreted according to "their ordinary, contemporary, common meaning."[3] *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d

---

3. The Court is also mindful that in applying this principle it must remain faithful to the purposes and objectives sought to be achieved by the regulation, and of course, the authorizing statute. *Citizens Council of Delaware County v. Brinegar,*

741 F.2d 584, 591 (3rd Cir.1984); *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (Learned Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

199 (1979); *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1534 (9th Cir.1994); *Nebraska Pharmacist's Ass'n, Inc.*, 863 F.Supp. at 1037; *see also Solano Garbage Co. v. Cheney*, 779 F.Supp. 477, 487 (E.D.Cal.1991) (holding, *inter alia*, that the ordinary principles of statutory construction apply with regard to the interpretation of administrative agency regulations). Paying particular attention to the key term "surface moisture", the Court observes that the common meaning of the word "surface" is: "exterior or upper boundary of an object or body." Mirriam–Webster's New Collegiate Dictionary, at 734 (10th ed. 1990). Turning next to the word "moisture", the Court observes that it is defined as: "liquid diffused or condensed in relatively small quantity." *Id.* at 1163. Applying these definitions, the Court finds that the term "drying for the removal of surface moisture" as used in 7 C.F.R. § 46.2(u), refers generally to the removal of any diffused or condensed liquid present in relatively small quantity on the exterior of fruits and vegetables.

A review of the record developed at the hearing reveals that this is not what occurred in this case. As noted previously, Abels testified that the Association of Foods Industries specification for Dried Apricots allows a maximum moisture content of only 24%. Transcript at 40. He also testified that in order to achieve this low moisture content, a substantial amount of an apricot's internal moisture is removed. Even if the Court were to accept Bedemco's assertion that some internal moisture will necessarily be removed while sun drying the outside of the fruit, it strains credulity to imply that a reduction in the amount necessary to turn a fresh apricot into a dried one is simply ancillary to, or merely a by-product of, the surface drying process. In contrast, the prunes do not pose nearly as close a question since dehydration for the express purpose of removing internal moisture, as admitted in the testimony of both Abels and Detoledo, clearly goes well beyond the drying of surface moisture permitted by the regulation.[4] Thus, the Court cannot find that these processes, which by design are intended to draw out not just some, but rather the majority of the internal moisture from the fresh commodity items which are subjected to them, i.e., in excess of 75% of the internal moisture from fresh apricots, and more than 90% of the internal moisture from plums, are consistent with the "drying for the removal of surface moisture" exception provided in 7 C.F.R. § 46.2(u). The Court concludes therefore, that the processing of fresh apricots and plums in the manner described in the testimony resulted in a fundamental change in the character of these commodities, such that the resulting products, i.e., dried apricots and prunes, can not be considered "fresh fruits" within the meaning of 7 C.F.R. § 46.2(u). Having so concluded, the transactions between Bedemco and the Debtor involving the sale of the dried apricots and prunes could not have given rise to the creation of a PACA trust under 7 U.S.C. § 499e(c)(2).

Further support for this conclusion is provided by the decision of the Court of Appeals for the Second Circuit in *Endico Potatoes*, heretofore, the only published opinion to specifically address whether or not transactions in particular minimally processed commodity food items were subject to the trust provision of PACA. Similar to the facts of the instant case, *Endico* involved a dispute between those who had produced and sold various products to, and an entity that had provided secured financing to, the debtor, a licensed dealer in perishable agricultural commodities. After determining that a PACA trust can only be created in transactions that involve the sale of perishable agricultural commodities, as opposed to the sale of derivative products,[5] the Second Circuit went on to

---

4. The Court also observes that the application of heat for the purpose of dehydrating a fruit or vegetable, as was the case here with respect to the prunes, Transcript, at 12 (Detoledo testified that in making prunes, plums are dehydrated in ovens), lies clearly outside the scope of the permitted use of heat for "insect control, ripening and coloring". 7 C.F.R. § 46.2(u).

5. The court found that while the creation of the trust is limited only to transactions in perishable agricultural commodities, the trust itself is not so limited, and can be comprised of commodities, derivative products, and proceeds from their sale. The court observed that if the creation of the trust were not limited in this way, there

consider the specific transactions involving the producers' various products to determine whether they gave rise a PACA trust. In so doing, the Second Circuit adopted the standard that had been articulated by the district court in the case below, stating that "PACA covers only those commodities that are in their natural form or are subject to

'a change in form which does not change the essential nature of the item, such as slicing, or a change which is meant only to temporarily preserve the fruit or vegetable, such as freezing or adding a preservative or chemical.'

*Id.*, 67 F.3d at 1070 (quoting *A & J Produce v. CIT Group/Factoring, Inc.*, 829 F.Supp. 651, 658 (S.D.N.Y.1993).

Relying on the above standard, the Second Circuit summarily affirmed the holding of the district court in disposing of the claims made by the producers of various processed food items, such as cream cheese with scallions, cole slaw, and frozen breaded cauliflower and onion rings, that had fresh commodities contents ranging from as little as 4% to as much as 90%. *Id.* at 1071. The district court held that the processed food items in question failed to qualify for PACA trust protection because the resulting products had undergone a fundamental change from the fresh state of the vegetables. 829 F.Supp. at 658.

The more difficult question, however, required the court to distinguish between two nearly identical forms of cut frozen potatoes. In both cases, fresh potatoes were steam peeled and sliced in the manner prescribed by the customer. The potatoes were then "water blanched" for 14–16 minutes at 160–180 degrees fahrenheit. After blanching, the potatoes were "surface seared" in a hot oil bath for 30 to 90 seconds in order to dry them prior to freezing, a step that the pro-

ducers asserted, without contradiction, was a necessary part of the water blanching operation. The purpose of this step was to prevent the potatoes from turning black once they were frozen. The difficulty arose with respect to only the final step in which some of the potatoes, at the request of the customer, would receive either a light bread coating, or a light spray of oil in order to make a french fry product that could be oven baked rather than deep fried. After finding that the Act protects both fresh and frozen fruits and vegetables, and that the regulation provided for water blanching, the court held that the producers could recover only for the potatoes without the additional oil or bread coatings. 67 F.3d at 1071. The court held that in contrast to the oil searing, the potato products that had been treated with either an oil spray or a light breading could not qualify for protection under PACA because neither treatment was an allowed element of the freezing process. Rather, the court held that in preparing the potatoes for a particular type of cooking, the character of the potatoes had been changed. *Id.*

Applying the standard adopted by the Second Circuit in *Endico*, this Court finds that the dried apricots and prunes involved here have been subjected to drying processes that clearly changed the essential nature of those items. 67 F.3d at 1070. First, as discussed above, both the sun drying and dehydration procedures employed greatly exceeded the drying for the removal of surface moisture exception provided under 7 C.F.R. § 46.2(u). Once employed, the drying processes tangibly affected the fresh commodities by not only extending their shelf life,[6] an arguably permitted effect, but more importantly, by altering their overall consistency, shape, and presumably also their taste. The result are

---

would be no rational means of limiting the language of Section 499e(c)(2) to cover less than all transaction in all derivative products, including even transactions in accounts receivable arising from the sale of those products. This result would be at odds with the language of the statute discussed above and its limited purposes as set out in section 499e(c)(1). *Endico*, 67 F.3d at 1070.

**6.** Abels testified that dried apricots have an expected shelf life of nine to twelve months if stored at 32 degrees fahrenheit, and six to seven

months if not refrigerated. Transcript at 34. The Court observes that the three fresh peaches introduced into evidence by Midlantic deteriorated to the point of becoming clearly inedible, even though refrigerated in chambers, within approximately a two week period after the hearing. In contrast, the packaged dried apricots also introduced into evidence by Midlantic, appear unchanged as of the entry of this Opinion. No evidence was introduced concerning the expected shelf life of either plums or prunes.

products that are markedly different from their fresh fruit counterparts. The sale of these items to the Debtor, therefore, did not entitle Bedemco to become a PACA trust beneficiary. *Id.* at 1071.

Based on the foregoing conclusions, the Court finds that the dried apricots and prunes are not "perishable agricultural commodities" within meaning of 7 U.S.C. § 499e(c)(2), and that accordingly, the sale of these products to the Debtor did not give rise to the creation of a PACA trust. Since Bedemco has failed to establish that it possesses an identifiable interest in the escrowed monies now in the possession of Midlantic, its motion for relief from the automatic stay and for turnover of that fund is denied.