**PHARMACEUTICAL SOCIETY OF THE STATE OF NEW YORK, INC., Still's Pharmacy, Inc., Riis–Wald Pharmacy, Inc., and M.F.K. Drug Co., Inc., Plaintiffs,**

v.

**Mario CUOMO, Governor of the State of New York, and Cesar A. Perales, Commissioner, New York State Department of Social Services, Defendants.**

No. 76 Civ. 5080 (KTD).

United States District Court,
S.D. New York.

Sept. 17, 1991.

Hinman, Straub, Pigors & Manning, P.C., Albany, N.Y. (Eileen M. Considine, of counsel), for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y. (Barrie L. Goldstein, of counsel), Otto G. Obermaier, U.S. Atty., S.D.N.Y., submitted *amicus curiae* memorandum, (Lorraine Novinski, of counsel), New York City, for defendants.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, the Pharmaceutical Society of the State of New York, Inc., Still's Pharmacy, Inc., Riis–Wald Pharmacy, Inc., and M.F.D. Drug Co., Inc. (collectively, the "Pharmaceutical Society") commenced this action in 1976 against defendants Governor of the State of New York, and the Commissioner of New York State's Department of Social Services ("DSS") (collectively "the State"), challenging New York State's promulgation of regulations implementing a new Medicaid pharmacy reimbursement methodology. All parties to the action entered into a Settlement Agreement on July 5, 1978. This post-settlement action contin-

ues from a dispute as to whether the new methodology violated federal Medicaid reimbursement regulations promulgated by the United States Department of Health and Human Services ("HHS") and administered by the Health Care Financing Administration ("HCFA"). The following outlines a more detailed history of the post-settlement action.

## PROCEDURAL HISTORY

On July 5, 1978, as part of a comprehensive settlement agreement ("Settlement Order"), the parties Stipulated ("the Stipulation") to a new methodology for drug reimbursements to pharmacies in New York State. The stipulation was so ordered by the court. In 1987, the State defendants unilaterally departed from the methodology outlined in the Stipulation, claiming that Federal law mandated the departure. Specifically, the federal government revised its pharmacy reimbursement regulations to implement aggregate upper limits ("AUL")[1] on medicaid reimbursements for certain defined medications. This meant that the State (and pharmacies) would be subject to a cap or ceiling on reimbursements. Additionally, federal subsidy could be severed were the State to formulate reimbursement calculations in excess that of the 1987 cap.

Subsequently, the State attempted by administrative regulation, to circumvent the reimbursement methodology required by the Stipulation. In response, the Pharmaceutical Society moved to compel compliance with the terms of the Stipulation. On February 28, 1988, I issued an injunction on behalf of Pharmaceutical Society, enjoining the State from implementing new methodologies not provided for by the terms of the Stipulation. Additionally, I found that new federal regulations merely established a reimbursement "cap," which the State could not exceed, and accordingly directed the State to abide by the terms of the Settlement Order.

The Second Circuit affirmed the injunction on September 2, 1988, stating that the

---

**1.** While the use of acronyms is generally distasteful to me, I am constrained to use them in this instance only because it appears to be the accepted practice of all of the parties involved.

Settlement Order required the State to consult with a pharmacy advisory committee ("PAC")[2] before implementing new regulations pursuant to the AUL method. However, the Circuit court did not preclude the State from formally moving to modify the Settlement Order. Familiarity with background and procedures to that date is assumed. For further explanation of the background in this case, see *Pharmaceutical Soc. of New York, Inc. v. Cuomo*, 856 F.2d 497 (2d Cir.1988).

Pharmaceutical Society then moved pursuant to Fed.R.Civ.P. 70 for contempt relief against the State due to its continued failure to comply with the Stipulation. At a hearing held before me on September 19, 1989, the State was found to be in contempt of the Stipulation and 1988 injunction. I further ordered expedited discovery and that the governor be produced in order to determine which State officials were responsible for the contempt. As a result of my finding that it was in violation of the 1988 injunction, the State returned to the use of the reimbursement methodology mandated by the terms of the Stipulation. The State further agreed to make retroactive reimbursement to pharmacists in order to cure any violation of the injunction up until the hearing date. Subsequently, the State moved pursuant to Fed.R.Civ.P. 60(b), and 70 to modify the Stipulation in order to permit them to implement an upper limits or AUL methodology for multiple source drugs,[3] and to dissolve the 1988 injunction.

Pharmaceutical Society cross-moved pursuant to Fed.R.Civ.P. 60(b) for modification of certain provisions in the Stipulation. In addition, Pharmaceutical Society seeks attorney's fees and sanctions pursuant to Fed.R.Civ.P. 11.

On January 31, 1991, the Pharmaceutical Society again moved to enforce particular provisions of the Stipulation which it perceived the State as violating. On February 11, 1991, the State filed a motion pursuant to Fed.R.Civ.P. 19 for joinder of the Secretary of Health and Human Services ("HHS") and the Administrator of the Health Care Financing Administration ("HCFA") as indispensable parties to this litigation. In response to the motion for joinder, HHS asserted that it did not wish to be joined, but requested leave of court to submit an *amicus curiae* memorandum. I granted such leave, and HHS submitted its *amicus* memorandum on April 26, 1991.

## DISCUSSION

The Medicaid program established by Title XIX of the Social Security Act is a cooperative federal-state program which was developed in order to furnish medical assistance to eligible low-income individuals. 42 U.S.C. § 1396 *et seq.* The program is jointly financed by the federal and state governments and is administered by the states. If a State chooses to participate in the federally created Medicaid program, it is enabled to include expenditures for prescription drugs among costs reimbursable by the federal government. 42 U.S.C. §§ 1396a(10)(A), 1396a(12). The federal share of Medicaid is known as federal financial participation ("FFP") and is only available if the Medicaid plan of a participating state has been approved by the HHS Secretary. *Id.*

A state can revise its state plan by submitting a proposed amendment for the Secretary's consideration. 42 U.S.C. §§ 1316(a)(2) and (3). While the Medicaid program is voluntary, states choosing to participate must submit a "state plan" that fulfills the requirements imposed by the Medicaid statute. Furthermore, the state plan must be approved by the HHS secretary. 42 U.S.C. § 1316(a)(1), 42 C.F.R. § 430.15. Thus, although states have considerable discretion to design and operate their individual programs, they must main-

---

**2.** The Pharmacy Advisory Committee has a checks and balance function to the State's power to regulate Medicaid reimbursement. It was developed, *inter alia,* in order to create a forum for evaluating existing regulations and advising on potential regulatory changes.

**3.** Multiple Source Drugs are drugs that are available under different brand names or both under a brand name and in generic form.

tain their plans in compliance with federal requirements in order to insure federal funding. *State of Louisiana v. HHS*, 905 F.2d 877, 878 (5th Cir.1990). Upon approval of the state plan, the state becomes entitled to its FFP reimbursement, a portion of which constitutes remuneration to pharmacies and other direct providers of services to Medicaid recipients. 42 U.S.C. § 1396b(a).

Detailed regulations exist for determining whether a state's plan complies with federal law and whether certain federal funding should be disallowed in the event of noncompliance. I am informed that in 1969, regulations were first promulgated governing the maximum expenditure for prescription drugs which a state may claim for the purpose of receiving certain participatory funding by the federal government. The upper limit was set as the lower of either (1) the cost of the drug to the pharmacist as defined by the state, plus a dispensing fee; or (2) the pharmacists' reasonable customary charges. 45 C.F.R. § 250.30(b)(2) (1970)

In 1976, the Secretary amended these regulations, which were in effect until 1986. The amended regulations recognized a distinction between drugs which are commonly dispensed through "multiple sources" or are available in generic form, and drugs which are described as "all others." For "all other drugs," reimbursement was predicated solely upon the estimated acquisition cost ("EAC"). 42 C.F.R. § 447.332(c)(1) (1986). EAC was defined by the Secretary as the participating state's best estimate of what price providers generally pay for a drug. On the other hand, reimbursement for multiple source drugs was predicated upon the lower of either (1) the maximum allowable cost ("MAC") as published in the Federal Register, or (2) the EAC. 42 C.F.R. 447.332(a)(1) (1986).

Having last amended the prescription drug regulations in 1987, the Secretary now subjects reimbursable drugs to an AUL methodology, prohibiting total state expenditures toward Medicaid assisted drug purchases from exceeding the combination of specific upper limits ("SULs") established for each drug.[4] Specifically, the HCFA promulgated amended regulations which set SUL's for the reimbursement of multiple source drugs and other drugs dispensed under state Medicaid programs.

In turn, New York State promulgated revised regulations adopting a drug specific AUL method for calculating the reimbursement for multiple source drugs, thereby unilaterally and without leave of court departing from the methodology mandated by the Settlement Order, which calculated the EAC for multiple source drugs based upon the average wholesale price ("AWP") paid for the drugs. Considine Affid. in Opposition to Motion for Joinder, at ¶ 5.

In its first post-judgment motion brought in February 1988, Pharmaceutical Society challenged the State's interpretation of the latest amendment to the prescription drug regulations. Pharmaceutical Society took exception to the State's imposition of stricter reimbursement calculation methods. In response, the State claims that the 1987 amendments required adherence to an AUL ceiling for multiple source drugs, thus forcing a change to stricter calculation methods.[5] Specifically, because the federal

---

**4.** Specific upper limits are upper limits on prices set for Medicaid program drugs. These limits are set pursuant to a schedule created by the federal government and each drug is allotted a specific price. States participating in federally subsidized Medicaid programs must purchase drugs at prices that do not exceed specific upper limits. This differs from aggregate upper limits in that, under AUL structured reimbursement calculation methods, participating states seeking FFP do not have to pay for drugs at the pre-scheduled prices. Instead, states may pay any price for a drug so long as the aggregate value for reimbursements does not exceed an

amount set by the HHS secretary. In other words, AUL methodology requires that a state not exceed a federally mandated amount toward Medicaid reimbursement, no matter how the state chooses to achieve that goal. If the state is not in compliance, it risks loss of FFP.

**5.** The upper limit on the acquisition cost of multiple source drugs was defined as the maximum allowable cost ("MAC"). The MAC was the lowest price at which a drug product was widely and consistently available for purchase by pharmacists, as determined by a federally established Pharmaceutical Reimbursement

government placed an AUL ceiling on State Medicaid programs, the State contends that it had to abandon its use of the AWP (as established by the Settlement Order) for calculating reimbursements because that method inevitably sets an onerous reimbursement rate upon the State, thus causing it to exceed the federal upper limits ceiling. Fearing loss of federal subsidy, the State justified its unilateral decision to change in methodology. Nonetheless, the State was acting in violation of the Settlement Order, without leave of court to modify that Order. Thus, although I directed the State to abide by the terms of the Settlement Order, under the circumstances the State was granted leave to properly apply for modification.

HHS adheres to its position that any state is free to adopt any reimbursement methodology as long as the federal upper limits are observed. Goldstein Feb. 11, 1991 Affid., Exh. B (HHS Letter Opinion). Nonetheless, the State now moves to dissolve the injunction on the grounds that it has complied with the Settlement Order by (a) meeting with the Pharmacy Advisory Committee on March 23, 1988 as required by paragraph 6;[6] and (b) demonstrating, as required by paragraph 11 of the Settlement Order, that the adoption of the AUL methodology provides the only reasonable alternative to insure receipt of available and approved federal funding.

At the time the parties entered into their agreement, the federal government had required that a drug's cost was to be determined on the basis of EAC. Therefore, there was no dispute among the parties as to whether EAC should be used. Rather, their dispute concerned how ingredient cost was calculated pursuant to EAC. Pharmaceutical Society maintains that the AWP must be used to figure EAC. Using AWP

methodology fashions more favorable reimbursements to pharmacists. The Settlement Order was designed to control the manner of the State's implementation of the EAC methodology and to prevent the State from unilaterally departing from the agreed method of calculation. Although no federally mandated methodology exists, the State is left to monitor its calculations and fashion Medicaid program reimbursements at a level not to exceed the federally mandated ceiling. The State is concerned here because the methodology mandated by the Settlement Order may cause the State to exceed the federal cap, thus risking loss of FFP. As such, it seeks to modify the order to insure FFP eligibility.

■ Courts are authorized to relieve a party from the effects of a consent decree if "it is no longer equitable that the judgment should have prospective application." *Koslowski v. Coughlin*, 871 F.2d 241, 246 (2d Cir.1989) (quoting Fed.R.Civ.P. 60(b)(5)). Additionally, a court of equity has the inherent power to modify a consent decree, when "circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *System Federation No. 91 Railway Employees Dept. v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). Indeed, such consent decrees must "be open to adaptation when unforeseen obstacles present themselves ... and to accommodation of a wider constellation of interests...." *New York State Ass'n For Retarded Children, Inc. v. Carey*, 706 F.2d 956, 968 (2d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).

Significantly, the Secretary's establishment of a reimbursement cap presents an obstacle unforseen by the parties. While the parties did contemplate that the federal

---

Board and published in the Federal Register. 39 Fed.Reg. 34519 (November 27, 1974), (codified at 45 C.F.R. § 250.30(b)(2) (1976)). The upper limit on the acquisition cost for all "other" prescription drugs was referred to as the estimated acquisition cost ("EAC"). The EAC was defined as "the State's closest estimate of the price generally and currently paid by providers" for the drug. Id. The Settlement Order at bar required that EAC be calculated by using

the average wholesale price ("AWP") for a class of medications.

6. The State had previously disbanded the PAC, however, the DSS reconvened the PAC and met with it for the first time on March 23, 1988, in an effort to comply with provisions of the Settlement Order.

government might "mandate" a change in methodology, it did not anticipate that a future regulatory initiative by the federal government might necessitate, although not "mandate," a departure from the EAC methodology that employs the AWP component. Indeed, unless the State strictly adheres to the upper limits established by the AUL methodology, it risks loss of FFP. The result occurs because the AUL methodology constitutes a cap which, in turn, establishes a *de facto* limit on individual drug prices. Pursuant to the Settlement Order, the State has calculated EAC on the basis of the AWP. If the State continues to use the AWP when this measure of price exceeds the upper limit per drug established by the AUL methodology, it is relatively certain that the State's reimbursement calculations may exceed the federally mandated cap.

According to a listing of medications currently paid for under Medicaid, the State demonstrated that it has paid in excess of $200,000 for calendar year 1990. *See* Falzano Affid. Aug. 15, 1991, and Exh. B. The list, representing medications most utilized in New York State, indicates that in every instance the AWP exceeded the federal SUL for these drugs. In some cases, the State paid more than $2.00 above the SUL for the same drug because of its obligation to pay at the AWP level. I see now that the price differential between the AWP and the SUL may well inevitably cause the State to exceed the AUL. Indeed, the State established that for the months of January, February, and March 1991, only 3% of the upper limit drugs paid for by the State have SULs which are lower than AWP. Falzano Affid. Aug. 15, 1991, at ¶ 6.

Thus, the State having amply demonstrated that its use of the AWP mechanism may cause it to exceed the ceiling of the AUL, modification of the Settlement Order appears vital to maintaining much needed FFP. Brankman Affid. Oct. 30, 1989, at ¶¶ 17, 23. When the State entered into the Settlement Order, it only consented to things as they were at the time of entry. At that time, federal regulation recognized the EAC methodology, and the State qualified for FFP thereunder. New York's system, pursuant to the current unmodified state of the Settlement Order which provides for reimbursing pharmacists for prescription drugs to Medicaid recipients employing the AWP component for calculating EAC, does not comply with applicable federal law insuring FFP.

Furthermore, the modification sought by the State here will further the public interest in that New York's treasury is severely strained. The State should not be saddled with the obligation to spend several millions on an optional program without the benefit of federal assistance. If it were constrained to do so under the Settlement Order, the State's complete withdrawal from participation could be a consequence. Furthermore, the Pharmaceutical Society offers no alternative calculation methods by which the State can remain eligible for FFP. Medicaid reimbursement recipients thus should not have to lose FFP before the State is found to have made its case.

In order to come into compliance, the State must change the methodology currently employed to determine the amounts payable to pharmacists in order to meet the AUL. To the extent that the Settlement Agreement and Order entered into by the parties prevents such a change, I must permit the modification of the terms of that agreement and order.

Finally, according to the Pharmaceutical Society, a federal budget moratorium provision which prohibits modifications in the Secretary's reimbursement limits likewise prohibits the State to modify the Settlement Order at bar. The moratorium provision of the federal Omnibus Budget Reconciliation Act of 1990 ("OBRA"), Pub. L.No. 101–508, 104 Stat. 1388, prohibits any modifications in the Secretary's reimbursement limits set forth in the regulations as in effect on the time of enactment of the statute. That provision also prohibits any reduction in either reimbursement limits or dispensing fees by any State that was in compliance with the regulations. In its *amicus* memorandum, the Secretary argues that the import of this moratorium is

to prohibit further reductions in reimbursement limits by those states that have established limits in conformity to the AUL regulations. I agree. The relevant provision provides:

(A) During the period of time beginning on January 1, 1991, and ending on December 31, 1994, the Secretary may not modify by regulation the formula used to determine reimbursement limits described in the regulations under 42 C.F.R. 447.331 through 42 C.F.R. 447.334 (*as in effect on the date of the enactment* of the Omnibus Budget Reconciliation Act of 1990) to reduce such limits for covered outpatient drugs.

OBRA, § 4401(a)(3) (emphasis added).

Although the Secretary agrees with the Pharmaceutical Society that the purpose of the moratorium was to protect pharmacists from *further* cuts in Medicaid Reimbursement, pharmacists in New York State have not yet suffered any such reductions. The moratorium therefore was not intended to protect them from cuts. Indeed, it defies logic to suggest that Congress intended the moratorium to prevent a state from coming into compliance with the regulations.

For the foregoing reasons, Pharmaceutical Society's motion is denied and the 1988 injunction is terminated. However, retroactive reimbursement to pharmacists participating in the New York Medicaid Program is hereby ordered, as calculated by the difference between the reimbursement owed pursuant to EAC methodology of drug reimbursement mandated by the Settlement Order and the wrongful modification implementing the AUL methodology, for the time period prior to the State's motion for modification. The State's motion for modification of the Settlement Agreement is hereby granted and the State is awarded leave to modify its procedures to the extent necessary to bring the State into compliance for FFP eligibility. This order is limited insofar as all modifications are retroactive to the time that the State moved to modify the Settlement Order. Proposed modifications in accordance with this decision should be submitted to me, on ten days notice, within twenty days of the date of this order. I see no present need to join the HHS secretary as a necessary party at this juncture.

SO ORDERED.