**PHARMACEUTICAL SOCIETY OF the STATE OF NEW YORK, INCORPORATED, Plaintiff–Appellee–Cross–Appellant,**

v.

**NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES & Michael Dowling, as Commissioner of the New York State Department of Social Services, Defendants–Appellants–Cross–Appellees.**

No. 539, Dockets 94–7215L, 94–7245XAP.

United States Court of Appeals,
Second Circuit.

Argued Nov. 3, 1994.

Decided March 30, 1995.

Eileen M. Considine, Albany, NY (Beverly Cohen, Hinman, Straub, Pigors & Manning, P.C., Albany, NY, of counsel), for plaintiff-appellee-cross-appellant.

John McConnell, Asst. Atty. Gen., Albany, NY (G. Oliver Koppell, Atty. Gen. State of NY, Peter H. Schiff, Deputy Sol. Gen. State of N.Y., Peter G. Crary, Asst. Atty. Gen., Albany, NY, of counsel), for defendants-appellants-cross-appellees.

Before LUMBARD, CARDAMONE and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellee-cross-appellant Pharmaceutical Society of the State of New York, Inc. ("the Society") brought suit in the United States District Court for the Northern District of New York seeking injunctive and declaratory relief against the New York Department of Social Services ("DSS") and Michael Dowling, as Commissioner of DSS (collectively "the State"). The suit was brought on the ground that N.Y.Soc.Serv.Law § 367-a(6) and N.Y.Comp.Codes R. & Regs. tit. 18, § 360–7.12, which require a co-payment by Medicaid recipients when they receive prescription drugs but waive the co-payment for those who cannot afford to pay it, are preempted by 42 U.S.C. § 1396r–8(e), which establishes a moratorium on the reduction of the limits of Medicaid payments to pharmacists. The Society initially obtained a preliminary injunction enjoining the State from enforcing the challenged statute and regulation, but was granted an exemption from the requirement of posting a bond in exchange for a waiver of the protections of the injunction bond rule. In a judgment entered on January 20, 1994, the district court granted a motion made by the Society for summary judgment, holding that the challenged portion of the State's co-payment system was in conflict with the federal statute. In that judgment, the district court also denied the Society's motion for reconsideration of its prior judgment granting the preliminary injunction. Both parties appeal from the judgments of the district court involving the preliminary injunction, and the State appeals from the grant of summary judgment in favor of the Society. We affirm in part, reverse in part, and remand.

## BACKGROUND

We assume familiarity with our decisions in *Pharmaceutical Society of the State of New York, Inc. v. Cuomo*, 856 F.2d 497 (2d Cir.1988), and *Still's Pharmacy, Inc. v. Cuomo*, 981 F.2d 632 (2d Cir.1992), which provide the factual background for the ongoing dispute between the parties to this appeal. We discuss here only those facts germane to the present dispute.

*1. The Medicaid System*

Medicaid is a state-administered, federally-subsidized program designed to provide needy individuals with medical care and services. In states that participate in the program, eligible individuals receive medical care at little or no cost, and the state reimburses the medical providers for the costs of the care or services. In turn, the federal government reimburses the state for a portion of those costs, provided that the state's Medicaid plan has been approved by the

federal government, and provided that the state abides by the regulations issued pursuant to the Medicaid statute. *See* 42 U.S.C. § 1396a(a), (b). New York State participates in Medicaid and includes the costs of prescription drugs provided by private pharmacists among those costs that it will reimburse. *See* N.Y.Soc.Serv.Law § 365–a(2)(g).

In order to remain eligible for federal subsidization of its Medicaid outlays ("federal financial participation" or "FFP"), the State's reimbursement to pharmacists who dispense drugs under Medicaid must remain within limits established by federal regulations. *See* 42 C.F.R. §§ 447.304, 447.331–.332 (establishing limits). These regulations provide that the reimbursable cost of a prescription encompasses both the "ingredient cost" of the drug itself and a reasonable dispensing fee. *See id.* § 447.331(b). The regulations also provide the method by which the federal government calculates the reimbursement limits. And while the state may use an alternate method of calculating the amount that it will reimburse pharmacists, the federal government will not reimburse a state for costs beyond those limits set by its regulations. *See Still's Pharmacy,* 981 F.2d at 635.

While the vast majority of the cost of medical services provided to Medicaid recipients is borne by the federal and state governments, federal law permits medical providers to charge the recipients themselves nominal amounts for services. *See* 42 U.S.C. § 1396o (a)(3); 42 C.F.R. §§ 447.53 & 447.57. These payments, known as co-payments, shift some of the cost of Medicaid to recipients because the co-payment reduces the amount of money that the state must reimburse the service provider. Under federal law, however, co-payment plans must provide that no individual otherwise eligible for Medicaid services may be denied those services on account of an inability to pay the co-payment. 42 U.S.C. § 1396o (e); *see also* 42 C.F.R. § 447.53(b) (describing who may be required to pay co-payments).

In April of 1992, the New York State Legislature enacted section 367–a(6) of the New York State Social Services Law, which establishes a co-payment system covering, *inter alia,* the provision of prescription drugs. In conformity with federal requirements, the co-payment law prohibited the denial of any services to an otherwise qualified individual for his or her inability to afford the co-payment. It also required New York's Commissioner of Social Services to issue a regulation implementing that policy. *See id.* § 367–a(6)(a), 367–a(6)(g)(i). As promulgated, the regulation permits a recipient simply to state to a Medicaid provider that he or she is unable to pay the co-payment; the provider then may not charge for the co-payment nor contest the individual's inability to pay. *See Sweeney v. Bane,* 996 F.2d 1384, 1386 (2d Cir.1993); *see also* N.Y.Comp.Codes R. & Regs. tit. 18, §§ 360–7.12(a) & 515.2(b)(17). A pharmacist, therefore, is required to dispense a prescription to a recipient who cannot pay the co-payment portion of the drug's cost, although the copayment "remains a debt" of the recipient to the provider. *See Sweeney,* 996 F.2d at 1386.

Accordingly, the State is able to reduce its reimbursement liability to pharmacists not only by the amount of co-payments that are collected by pharmacists, but also by the amount of co-payments the pharmacists are unable to collect because of the recipients' inability to pay. As a result, pharmacists stand to lose a substantial amount of money as long as New York's co-payment system is in place, because an estimated 50% of Medicaid recipients cannot afford the co-payment.

### 2. The Omnibus Budget Reconciliation Act of 1990

The Medicaid statute is not the only congressional legislation that relates to the reimbursement of pharmacists. In 1990, Congress passed the Omnibus Budget Reconciliation Act ("Omnibus Act"), as amended, codified at 42 U.S.C. § 1396r–8, subsection (e) of which provides:

**Treatment of pharmacy reimbursement limits**

**(1) In general**

During the period beginning on January 1, 1991, and ending on December 31, 1994—

(A) a State may not reduce the payment limits established by regulation under this

subchapter or any limitation described in paragraph (3) with respect to the ingredient cost of a covered outpatient drug or the dispensing fee for such a drug below the limits in effect as of January 1, 1991, and

**(B)** except as provided in paragraph (2), the Secretary [of Health and Human Services] may not modify by regulation the formula established under sections 447.331 through 447.334 of title 42, Code of Federal Regulations, in effect on November 5, 1990, to reduce the limits described in subparagraph (A).

**(2) Special rule**

If a State is not in compliance with the regulations described in paragraph (1)(B), paragraph (1)(A) shall not apply to such State until such State is in compliance with such regulations.

**(3) Effect on State maximum allowable cost limitations**

This section shall not supersede or affect provisions in effect prior to January 1, 1991, or after December 31, 1994, relating to any maximum allowable cost limitation established by a State for payment by the State for covered outpatient drugs, and rebates shall be made under this section without regard to whether or not payment by the State for such drugs is subject to such a limitation or the amount of such a limitation.

The statute thus places a moratorium on the altering of the "payment limits" by states that are in compliance with the regulations setting those limits. So while New York's co-payment scheme operates to reduce the payments that pharmacists receive for providing drugs to Medicaid recipients, the Omnibus Act appears to bar states from reducing those payments, if the state is "in compliance" with the regulations establishing the limits.

In September of 1993, the Society commenced the action giving rise to this appeal, alleging that New York Soc.Serv.L. § 367–a(6) and N.Y.Comp.Codes R.R., tit. 18, § 360–7.12 (the co-payment statute and regulation) were in conflict with and preempted by 42 U.S.C. § 1396r–8(e) (the Omnibus Act provision placing a moratorium on reductions

in payment limits). The Society contended that New York's co-payment system reduced the "payment limits" because the pharmacists were not being reimbursed for unpaid co-payments. The Society moved for a preliminary injunction enjoining the State from enforcing its co-payment system, and, in November of 1993, the district court granted the injunction. In January of 1994, the district court granted a motion for summary judgment made by the Society, concluding that the Omnibus Act's moratorium on limits reduction prohibited New York from shifting the cost of unpaid co-payments to the pharmacists. New York appeals from that judgment, and both parties appeal from portions of the judgment granting the preliminary injunction.

### DISCUSSION

The central issue before us is whether New York's co-payment system is preempted by the Omnibus Act's moratorium on the reduction of "payment limits." New York makes two arguments in support of its position that its co-payment system is not preempted. First, it contends that the "payment limits" have not been reduced by the co-payment scheme. Conceding that pharmacists will receive less money as long as some co-payments are not made to them, the State contends that the statute prohibits only changes in "limits," not in actual amounts paid. Second, New York notes that the Omnibus Act's moratorium applies only to states "in compliance" with the reimbursement guidelines set by the federal government. Relying principally on litigation that established that New York was in violation of certain federal standards, the State contends that the moratorium does not apply to it. We address these arguments in turn.

*1. Reduction in Payment*

■ The State urges that a literal reading of the statute indicates that only "payment limits" may not be reduced. Under this reasoning, the State may use other methods to reduce the amount of money that pharmacists receive as long as the "limits" are not reduced. We reject this position.

We first note that New York's position would appear to justify the denial of all reimbursement to pharmacists, as long as the state did not alter the formula for calculating the limits. Such a result would be absurd, and we therefore refuse to adopt an interpretation that would lead to it. *See Andrulonis v. United States,* 26 F.3d 1224, 1235 (2d Cir.1994). Instead, we conclude that in enacting the moratorium, Congress intended to protect the actual level of reimbursement flowing to pharmacists. The court in *Nebraska Pharmacists Ass'n, Inc. v. Nebraska Dep't of Social Services,* 863 F.Supp. 1037 (D.Neb.1994) reached the same conclusion. In that case, as here, plaintiffs contended that a co-payment scheme under which pharmacists were not reimbursed by the state for co-payments not made by Medicaid recipients was preempted by the Omnibus Act's moratorium. The court agreed with the plaintiffs, refusing to attribute to Congress the intent to protect only "abstract formulas." *Id.* at 1043. A co-payment scheme such as Nebraska's, the court concluded, would "render[ ] the prohibition against reduction in limits ... meaningless." *Id.* at 1043; *see also Pennsylvania Pharmaceutical Ass'n v. Casey,* 800 F.Supp. 173, 178 (M.D.Pa.1992) (Omnibus Act "clearly forbids a compliant state from reducing payments for covered outpatient drugs").

Similarly, in *Indiana Pharmacists' Association v. Indiana Family and Social Services Administration,* 881 F.Supp. 395 (S.D.Ind. 1994), the court concluded that the moratorium precludes reductions in reimbursement that result from the non-payment of co-payments. Significantly, in that case the Secretary of HHS had submitted an *amicus* brief, taking the position that such reductions were permissible. The court, however, concluded that HHS's position was entitled to little deference because it was a product of litigation and not a formal statement of policy. The court concluded that interpreting the statute to permit a reduction in reimbursement through the non-payment of co-payments was unreasonable.

We agree with the courts that have held that the Omnibus Act prohibits reductions in payments to pharmacists and does not simply prohibit the reduction of the numerical limit. This conclusion is further supported by letters written by officials of the Department of Health and Human Services and sent to state agencies taking the position that the moratorium was designed to prohibit reductions in the amount of money paid to pharmacists. Accordingly, we conclude that, to the extent that the State's co-payment system results in the reduction of payments to pharmacists as a result of non-payment of co-payments, it is preempted by 42 U.S.C. § 1396r–8(e).

### 2. Compliance

The State also contends that prior cases establish that it is not in compliance with the federal regulations setting forth payment limits for drug cost reimbursement, and therefore that it is not constrained by the moratorium. The Society, on the other hand, argues that compliance may only be determined through the administrative process established by the federal government. We reject both positions, and we remand so that the district court may determine whether New York is or is not in compliance with the federal regulations. This issue, however, requires some additional background.

As noted above, the State reimburses pharmacists both for the "ingredient" cost of the dispensed drug, which is the cost of the drug itself, and for a "reasonable dispensing fee." *See* 42 C.F.R. §§ 447.331(b)(1), 447.332(b). In addition, the regulations draw a distinction between reimbursement for generic drugs (referred to in the regulations as "multiple source drugs" or "MSDs") and for non-generic drugs (referred to in the regulations as "other drugs"). *See id.* § 447.331. The parties to this litigation have long disputed the manner in which these amounts are to be calculated and, in 1978, the District Court for the Southern District of New York approved a settlement (the "Settlement Order") between the parties in partial resolution of this dispute. In the Settlement Order, the parties agreed that the State would reimburse pharmacists for the Estimated Acquisition Cost ("EAC") of the ingredient portion of each dispensed drug. EAC was to be calculated by using the Average Wholesale Price ("AWP") paid by the pharmacists for

the drugs that they dispensed. In addition, the Settlement Order provided that pharmacists would be reimbursed for a dispensing fee of $2.60 per prescription.

At the time that the above agreement was reached, the EAC method was the method used by the federal government. *See* 42 C.F.R. §§ 447.331–.332 (1986). In October of 1987, however, the Health Care Financing Administration ("HCFA"), the federal agency charged with the administration of the Medicaid statute, changed the method by which it calculated reimbursement for the ingredient cost of MSDs. Under the new method, HCFA publishes tables listing the maximum prices to be used in reimbursing the states for generic drug prescriptions. These prices are referred to in the regulations as Specific Upper Limits ("SULs"). *See* 42 C.F.R. § 447.332(b). To be eligible for FFP, a state's total drug prescription expenditures cannot exceed the "Aggregate Upper Limit" or "AUL," which simply is the sum of the SULs for each prescription dispensed, plus reasonable dispensing fees.

The reimbursement of the cost of "other drugs" continues to be calculated by aggregating the lower of (i) the EAC plus a reasonable dispensing fee; or (ii) the pharmacist's usual and customary charge for the drug. *Id.* § 447.331(b). The AUL for "other drugs" is the amount that the state would pay if it paid for each non-generic drug at the lower of these two figures. *Still's Pharmacy*, 981 F.2d at 635.

In January of 1988, New York State amended its regulations and adopted the new method of calculating reimbursement, so as to remain in compliance with federal regulations. The Society commenced a suit to enforce the Settlement Order, but the district court eventually granted a motion made by the State to amend the Settlement Order to allow use of the new reimbursement method. In so holding, the district court reasoned that, with respect to the ingredient cost of MSDs, the AWP method of reimbursement brought the State out of compliance with federal limits because in most instances the AWP exceeded the SUL. *See Pharmaceutical Society of the State of New York, Inc. v. Cuomo*, 774 F.Supp. 826, 831 (S.D.N.Y.1991).

With respect to the ingredient cost of "other drugs," the district court held that, to bring the State into compliance, the Settlement Order should be amended to calculate the EAC by discounting the AWP by ten percent. *See Still's Pharmacy*, 981 F.2d at 636.

In December of 1992, this Court affirmed the district court's decision with respect to the ingredient cost of MSDs. *See id.* at 637. As for the district court's treatment of "other drugs," however, we concluded that the record did not support the conclusion that a ten percent discount of the AWP would establish New York's compliance. *Id.* at 638–39. We thus remanded for a hearing on the issue of New York's compliance with the regulations regarding the ingredient cost of "other drugs." *Id.* at 639. We also found the dispensing fee of $2.60 to be unreasonably low, and remanded for a hearing to determine how much the fee should be increased. *Id.*

■ The State now contends that the litigation culminating in *Still's* establishes that it is not "in compliance" with the federal regulations. We disagree. As an initial matter, we conclude that a state is "in compliance," for the purposes of section 1396r–8(e), when its reimbursement is equal to or less than the AULs established by the federal regulations. That is, by exempting states that were not "in compliance" from the moratorium, Congress sensibly permitted states that were exceeding the AULs to reduce their payments to come into line with federal regulations. This interpretation of "in compliance" was urged by the Secretary of Health and Human Services and adopted by the district court in *Pharmaceutical Society*, 774 F.Supp. at 831–32, although at the time of appeal the issue had become moot, *see Still's*, 981 F.2d at 640. Furthermore, we refuse to attribute to Congress the nonsensical intent to permit a state that is, for example, paying an unreasonably low dispensing fee to reduce that fee further because the state is not "in compliance" with the regulations.

■ Having concluded that "in compliance" means "not exceeding the AULs," we must remand. As noted above, in *Still's* we concluded that: (1) the State was reimburs-

ing pharmacists too much for the ingredient cost of MSDs, (2) a hearing was required to determine whether the State was reimbursing pharmacists too much or too little for the ingredient cost of "other drugs"; and (3) the State's dispensing fee was unreasonably low. Neither of the parties has presented evidence as to how or whether these issues have been resolved, and we thus have no basis for concluding where the State stands in relation to the federal regulations. If it is determined that New York is exceeding the AULs, it is not "in compliance" with the regulations and may reduce its reimbursement until it conforms to them; if the state is already reimbursing the amount provided by the regulations or less, it may not use any mechanism, including its co-payment system, to reduce those payments further.

We thus reject the Society's argument that the determination of compliance may be made only by the Department of Health and Human Services after formal notice and hearing. We also reject the State's argument that a letter from HCFA noting "unresolved compliance issues" is sufficient to establish non-compliance. Instead, we conclude that the determination of compliance should be made by the district court after a hearing. As the history of this dispute indicates, federal courts are fully capable of making findings of compliance like those at issue here. *See Still's Pharmacy, Inc. v. Cuomo,* 981 F.2d at 637; *see also Pennsylvania Pharmaceutical Ass'n v. Casey,* 800 F.Supp. 173, 176–78 (M.D.Pa.1992) (finding state in compliance with regulations at issue here). However, the district court should not, as it did below, "presume" that the State was in compliance, but should treat compliance as it would any other mixed question of fact and law.

### 3. Preliminary Injunction

The remaining issues pertain to the district court's grant of a preliminary injunction enjoining New York from enforcing its co-payment system. In granting the injunction, the court did not require the Society to post a bond pursuant to Fed.R.Civ.P. 65(c), but it did require the Society to waive the protections of the "injunction bond rule." The

latter rule provides that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2186 n. 14, 76 L.Ed.2d 298 (1983). Therefore, while the Society posted no bond, it was subject to enormous liability, given that the State projected damages of $25 million dollars resulting from the grant of the injunction.

In crafting this compromise, the district court reasoned that in most cases where the bond requirement was waived, the party seeking the injunction was a public interest entity or indigent plaintiff, while here the Society was acting in its own pecuniary self-interest. We conclude that the district court correctly waived the bond requirement, but erroneously required the Society to waive the protection of the injunction bond rule.

Rule 65(c) of the Federal Rules of Civil Procedure provides in part that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." Although the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for, *inter alia,* cases involving the enforcement of "public interests" arising out of "comprehensive federal health and welfare statutes." *See Crowley v. Local No. 82, Furniture & Piano Movers,* 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). This exception was relied upon in *Temple University v. White,* 941 F.2d 201 (3rd Cir.1991), where the court upheld the waiver of the bond requirement in a case in which a hospital had brought suit to ensure that Pennsylvania complied with the Medicaid Act. The court there noted that the hospital had "pursued a course of litigation clearly in the public interest, i.e., it seeks to preserve its role as a community hospital serving a disproportionate share of low income patients." *Id.* at 220.

■ The Pharmaceutical Society's litigation here similarly is in the public interest.

While the district court found that the Society was unlike a traditional public interest group because it was pursuing its pecuniary interests, we believe that the nature of the rights being enforced, rather than the nature of the entity enforcing them, is the central consideration in determining whether the bond requirement should be waived under this exception. Here, the Society sued to ensure that pharmacies providing Medicaid services would receive full compensation for those activities. To the extent that pharmacies do not receive full compensation, some are likely to drop out of the Medicaid program and reduce the number of providers of health care to poor individuals. And, if they continue as providers, they will simply pass on the costs of the uncollected co-payments to the public at large. Thus, the Society's litigation was indeed pursued to enforce "public interests" rising out of a comprehensive health and welfare statute, and the district court's waiver of the bond requirement was proper.

The district court erred, however, in requiring the Society to waive the protections of the injunction bond rule. In requiring the waiver, the district court relied upon *Continuum Co. v. Incepts, Inc.,* 873 F.2d 801, 804 (5th Cir.1989). In that case, the court allowed a party to post a bond that was clearly insufficient to cover potential damages, but required the party seeking the injunction to file an undertaking stating that the amount of the bond would not limit the amount of damages for which it might be liable as a result of the wrongful issuance of the injunction. *Id.* at 804. This course was taken because, while a large bond was beyond the resources of the plaintiff at the time of litigation and would likely have rendered the injunction useless, the plaintiff-corporation's earnings eventually would permit it to satisfy a potential judgment. *Id.*

We find the application of the *Continuum* rule to be error under the circumstances of this case. The State here sought a bond of approximately $25 million. To expose the Society to liability of that scope would be to place too great a burden on litigation pursued in the public interest. Moreover, the shortcomings of the *Continuum* rule are made evident by both parties' dissatisfaction with its application here, which likely arises from the rule's internal inconsistency: the party seeking the injunction is relieved from posting a bond it cannot afford, but will be exposed to a liability that it equally cannot afford. In such a situation, neither side is properly protected. We thus conclude that the Society should not have been required to waive the protection of the injunction bond rule, and that the State accordingly has no action for damages occasioned by the grant of the preliminary injunction. *See W.R. Grace & Co.,* 461 U.S. at 770 n. 14, 103 S.Ct. at 2186 n. 14.

## CONCLUSION

We affirm the portion of the district court's judgment holding that the State's co-payment scheme conflicts with federal law. We reverse the portion of district court's judgment that presumes that the State is in compliance until HCFA determines otherwise, and we remand so that the district court may make its own determination of compliance. Furthermore, we affirm the district court's waiver of the bond requirement, but reverse its requirement that the plaintiff waive the protection of the injunction bond rule.